## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DOUGLAS BERNSTEIN, ELAINE INGULLI, TERRY HALBERT, EDWARD ROY, LOUIS PENNER, and ROSS PARKE, as personal representative of THE ESTATE OF ALISON CLARKE-STEWART, on behalf of themselves and others similarly situated<br><br>                    Plaintiffs,<br><br>          vs.<br><br>CENGAGE LEARNING, INC.<br><br>                    Defendant. | Civil Action No.  19-cv-7541<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Douglas Bernstein, Elaine Ingulli, Terry Halbert, Edward Roy, Louis Penner, and Ross Parke, as personal representative of the Estate of Alison Clarke-Stewart, on behalf of themselves and all others similarly situated ("Plaintiffs"), for their Complaint against defendant, Cengage Learning, Inc. ("Cengage"), state as follows:

### NATURE OF THE ACTION

1.      Plaintiffs and members of the putative class are professors and leading academics who authored academic textbooks and entered into contracts with Cengage (or its predecessors-in-interest) to publish, sell, and distribute Plaintiffs' textbooks ("Publishing Agreements").

2.      The Publishing Agreements each require that Cengage pay Plaintiffs royalties on the net receipts from the sale of their works.  However, Cengage has adopted a class-wide policy of *diluting* the net receipts from which royalties are calculated and paid to Plaintiffs simply because the sale at issue happened to occur digitally.  Cengage's digital-sale financial alchemy violates the plain language of the Publishing Agreements.

3.      Cengage has recently introduced two new digital sales channels to increase its revenues from the sale of Plaintiffs' works, and those digital platforms are called (i) MindTap and (ii) Cengage Unlimited.  These two digital offerings have been wildly successful, so much so that Cengage attributes them to causing Cengage to have "outperformed our competitors and improved the performance of our Higher Ed business.  We were able to make significant investments in our strategic priorities while also generating positive free cash flow . . . ."[1]

4.      MindTap provides an electronic version of Plaintiffs' coursebooks with multimedia capabilities (e.g., a highlighting tool) and materials like quizzes.  Cengage has sold the authors' works through MindTap to over 2.7 million users.

5.      The Publishing Agreements require that Cengage calculate royalties for any sale of Plaintiffs' works by applying the contractually specified royalty rate to the net receipts from sales of their works.  However, Cengage has treated the sale of Plaintiffs' works on MindTap differently, with no authorization to do so under the Publishing Agreements.

6.      Rather than following the net-receipts-of-sales contractual requirement, Cengage has unilaterally diminished the amount of revenue from MindTap that should be royalty-bearing by applying haircuts.  Specifically, Cengage chops-off revenue by applying (i) an arbitrary determination of "appropriate value" to Plaintiffs' works sold on MindTap, and (ii) a made-up "relative value" of various MindTap components that are used with Plaintiffs' works.  These two accounting shenanigans financially harm Plaintiffs and are not authorized anywhere in the Publishing Agreements.

---

[1] *See Cengage Unlimited's First Full Academic Year Shows Significant Success with Students, Drives Company's Full Year Financial Performance*, April 25, 2019, available at https://news.cengage.com/corporate/cengage-unlimiteds-first-full-academic-year-shows-significant-success-with-students-drives-companys-full-year-financial-performance/

7.      As for Cengage Unlimited, that is a subscription service for digital higher education materials.   Plaintiffs' works are offered on Cengage Unlimited. A subscription provides access to more than 22,000 products across 70 disciplines and more than 675 courses for one price. Cengage heavily promotes this new subscription service. When students go to Cengage's website to buy a book, Cengage immediately directs them to its "Unlimited" product. In eight months, Cengage Unlimited has attracted more than 1 million subscribers.  Cengage has credited the new program with increasing its market share in U.S. higher education and bolstering its courseware activations by 15%.

8.      The Publishing Agreements require payment of royalties on the net receipts from sales. However, for sales that occur through Cengage Unlimited, Cengage applies a different formula found nowhere in its contracts with Plaintiffs. Cengage looks to what it deems, apparently by its mere say-so, the "relative value" to Cengage Unlimited subscribers of a particular work and the weighted average of the number of uses of that work, and then pays a royalty off that manufactured calculation. The Publishing Agreements, however, do not provide for the application of this made-up formula that serves to enrich Cengage and reduce the royalty-bearing revenue of its authors.

9.      Rather than paying authors pursuant to the terms of their contracts, Cengage has made its own decisions about how and from what pool of money to pay authors' royalties. Cengage has stopped paying Plaintiffs royalties on net receipts from sales, as the Publishing Agreements require.  This class action therefore alleges a breach of contract for damages due to Cengage's uniform violations of its Publishing Agreements.  The advent of new digital sales channels for academic textbooks is not an excuse to somehow start cheating the textbooks' authors and violate their binding contracts with Cengage.

## THE PARTIES

10.     Professor Douglas Bernstein is a co-author of *Introduction to Psychology*, also sold as *Psychology: Foundations and Frontiers* ("*Psychology*"), and *Essentials of Psychology*. Professor Bernstein entered into an agreement dated June 2, 1983 with Cengage through its predecessor-in-interest Houghton Mifflin Company ("Houghton Mifflin") for *Psychology* (the "*Psychology* Agreement"). Professor Bernstein also entered into an agreement dated December 27, 1996 with Cengage through its predecessor-in-interest Houghton Mifflin for *Essentials of Psychology* (the "*Essentials* Agreement"). Professor Bernstein resides in Florida.

11.     Professor Edward Roy is a co-author of *Psychology* and *Essentials of Psychology*. Professor Roy entered into the *Psychology* Agreement with Cengage, through its predecessor-in-interest Houghton Mifflin, on June 2, 1983. Professor Roy entered into the *Essentials* Agreement with Cengage, through its predecessor-in-interest Houghton Mifflin, on December 27, 1996. Professor Roy resides in Illinois.

12.     Ross Parke is the personal representative of the Estate of Alison Clarke-Stewart, which is the successor-in-interest of the rights and obligations of the deceased Professor Alison Clarke-Stewart. Professor Clarke-Stewart was a co-author of *Essentials of Psychology*. Professor Clarke-Stewart entered into the *Essentials* Agreement on December 27, 1996, and the Estate of Alison Clarke-Stewart is Professor Clarke-Stewart's successor-in-interest under the *Essentials* Agreement. Professor Clarke-Stewart resided in California.

13.     Professor Louis Penner is a co-author of *Psychology* and *Essentials of Psychology*, beginning with the Second Edition of the work. Professor Penner entered into the *Psychology* Agreement with Cengage, through its predecessor-in-interest Houghton Mifflin, on March 26, 1998, when he was added as a co-author of *Introduction of Psychology* by amendment

to the *Psychology* Agreement. Professor Penner entered into the *Essentials* Agreement with Cengage, through its predecessor-in-interest Houghton Mifflin, on October 18, 2000, when he was added as a co-author of *Essentials of Psychology* by amendment to the *Essentials* Agreement. Professor Penner resides in Michigan.

14.     Professors Elaine Ingulli and Terry Halbert are co-authors of *Law, Ethics and Responsibility: The American Legal Environment*, sold as *Law and Ethics in the Business Environment* ("*Law and Ethics*"). Professors Ingulli and Halbert entered into an agreement dated April 8, 1988 with Cengage through its predecessor-in-interest West Education Publishing for *Law and Ethics* (the "*Law and Ethics* Agreement"). Professor Ingulli resides in New Jersey and Professor Halbert resides in Pennsylvania.

15.     Defendant Cengage Learning, Inc. ("Cengage") is a Delaware corporation with offices in New York.  Cengage is an education and technology company that serves the higher education, K-12, professional, library and workforce training markets worldwide.

16.     On May 1, 2019, Cengage announced its intention to merge with McGraw-Hill, a deal that would make it among the top providers of college textbooks and educational materials in the country.  The merger has not yet closed.  The companies have said the deal will be used "to expand digital offerings and cut prices."

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332(d) because this is a class action with diversity between at least one class member and one defendant and the aggregate amount of damages exceeds $5,000,000.  This action therefore falls within the original jurisdiction of the federal courts pursuant to the Class Action Fairness Act, 28 U.S.C § 1332(d).

18.     This Court has personal jurisdiction over Cengage because Defendant is registered to do business in the State of New York, maintains an office at 5 Greene Street in New York, and events giving rise to this lawsuit occurred in New York. Upon information and belief, Cengage markets and sells *Essentials of Psychology*, *Psychology*, *Law and Ethics*, and other authors' works in New York; has sold and continues to market and sell MindTap versions of the works in New York; and has sold and continues to sell the works through Cengage Unlimited subscriptions sold in New York.

19.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)-(c) because events giving rise to the causes of action occurred in this District.

## FACTUAL BACKGROUND

20.     Cengage is one of the largest providers of learning solutions in the approximately $3.4 billion U.S. higher education learning solutions market.

21.     In higher education, Cengage has leading market positions in the United States in many of the largest academic disciplines, including the number one position in several areas such as Business Law and Business Communications, Social Work, Introductory Computing, Nutrition, Calculus, and Cosmetology and has the number two position in areas such as Economics, Chemistry, Political Science, and Criminal Justice, and Business Statistics.

22.     Over time, Cengage has migrated many of its offerings from textbooks to digital solutions.

23.     For the fiscal year ending in March 31, 2018, Cengage's digital product sales comprised approximately 53% of its total Adjusted Revenues compared with 50% for the fiscal year ending March 31, 2017.  From 2017 to 2018, Cengage's core digital solutions were available for approximately 95% of its academic portfolio of learning solutions.

A.     **MindTap and Cengage Unlimited**

24.     Over the last five years, Cengage has penetrated the market with MindTap. MindTap is an electronic platform through which a student has access to an electronic version of a student textbook, along with homework, quizzes, tests, and multimedia materials. MindTap also provides feedback and analytics for instructors and students.

25.     Cengage's MindTap platform contributed approximately $249.6 million of its gross sales for the fiscal year ended March 31, 2018, an increase of approximately 29% from the fiscal year ended March 31, 2017. In the fiscal year that ended March 31, 2018, MindTap activations alone have increased 39%.

26.     In the second half of fiscal year 2018, Cengage announced the launch of its subscription service called Cengage Unlimited for its U.S. Higher Education business. Cengage claims Cengage Unlimited is the first-of-its-kind subscription service for digital higher education materials. A subscription provides access to most of Cengage's electronic catalog for a flat, per-semester fee. The per-semester fee gives the subscriber access to electronic versions of all textbooks within the Unlimited platform. Unlimited subscribers also have the option of renting a paper textbook at an additional per-book fee.

27.     Cengage views Cengage Unlimited as a key pillar of its growth strategy.   The shift away from print has allowed Cengage to decrease capital expenditures, realize revenue from each end user, and enhance profitability.

B.     **Publishing Agreements**

28.     Cengage and its predecessors-in-interest entered into Publishing Agreements with authors regarding publication rights to textbooks and other works.

29.    Under these Publishing Agreements, authors are paid a royalty percentage based on net receipts from the sale of their works. The remainder of the revenue is kept by Cengage.

30.    For example, the *Psychology* Agreement provides: "On all sales of the Work by the Publisher, other than Foreign Sales, Special Sales, and the disposition of Subsidiary Rights, as set forth in Paragraphs 10, 11, and 12 herein, the *Publisher shall pay the Author a royalty based on the Publisher's net receipts*, in accordance with the following schedule: 18% of the net receipts. . . . Net receipts shall be deemed equal to gross revenues minus only returns, exchanges, discounts, and other allowances, and excluding packaging and shipping charges, and sales or excise taxes shown separately on the invoice."

31.    Similarly, the *Essentials* Agreement states that "[t]he payments to each Author shall be determined by reference to a total royalty computed as *a percentage of the Publisher's Net Receipts* on U.S. sales in accordance with the following schedule: 18% of Net Receipts for all copies of the student text sold during the life of the edition."

32.    The *Law and Ethics* Agreement also applies a royalty rate to a specified calculation of net receipts from sales of the work: "[Publisher] Will pay the following compensation to the Author: (a) 15 % of *net paid sales (paid sales less credits and returns* of the Work in book form except as provided for in (b); (b) 7.5% of . . . (iii) net paid sales of the Work in all other forms including, without limitation: . . . electronic, machine-readable and computerized forms."

33.    All publishing agreements contain a substantively identical royalty payment calculation that provides for:

(1) a royalty rate or schedule of royalty rates, applied to

(2) net receipts, from

(3) sales of the works.

**C.     Cengage's Unlawful Manipulation of and Decrease to Authors' Royalty Base**

34.     Cengage is not paying authors royalties on the net receipts from the sales of works that are sold through MindTap or works that are included in the Cengage Unlimited platform. Cengage instead is unilaterally assigning a royalty base for MindTap and Cengage Unlimited sales that is different from the net receipts from the sales of the works.

35.     None of Cengage's Publishing Agreements have a special carve-out for and exception to authors' works sold through the MindTap or Cengage Unlimited platforms. The contracts also do not provide for any special formula or allocation of revenue from those digital platforms. Instead, all of the Publishing Agreements adhere to a straightforward royalty calculation: a contractually-specified royalty rate applied to net receipts from sales of the work.

36.     With respect to sales of works through MindTap, Cengage has admitted that it does not apply the contractually-determined royalty rate to net receipts from the sales of the authors' works. Instead, Cengage reduces the revenue base used to calculate an authors' royalty, ostensibly based on its own internal analysis of the "appropriate value" of Cengage's contributions to the digital platform used to sell the authors' work.

37.     In some cases, Cengage is giving authors zero royalty on as much as 50% of the revenue it obtains from a MindTap sale—even though the author's work is driving all of the content made available on MindTap (for example, multimedia versions of the book).  Nothing in the Publishing Agreements gives Cengage the right to depart from the royalty-calculation formula enshrined in the Publishing Agreements to account for what Cengage believes it contributed to the digital platform used to sell Plaintiffs' textbooks.

38.     While Cengage has acknowledged its obligation to pay royalties on its sales of electronic versions of the authors' works, it has denied that its unilateral decision to slash authors' royalty bases for MindTap sales breaches the Publishing Agreements. This is wrong. But even if Cengage's story is to be believed—*i.e.*, even if Cengage is permitted under the Publishing Agreements to deduct from authors' royalty bases the "appropriate value" of additional elements that Cengage unilaterally included with the sale of the authors' works— Cengage is still in breach of the Publishing Agreements because it is not fairly or accurately ascribing portions of net MindTap revenues as royalty-bearing versus non-royalty bearing.

39.     Cengage recognizes that authors' content is the driving force behind its digital offerings.  In its 2018 Annual Report, Cengage touted that its "ability to develop authoritative, pedagogically-sound content linked to [its] digital solutions and assessments" is a result of its "long-term partnerships with authors who are recognized experts in their fields and with third-party licensors of authoritative research materials." Yet, as noted, Cengage is giving authors, in some instances, *zero* royalty on as much as 50% of the revenue it obtains from a MindTap sale, reflecting the implausible, unfair, and inaccurate conclusion, found nowhere in the Publishing Agreements, that half of the revenue from a MindTap sale of a textbook is not attributable to the work.

40.     Cengage does not even make MindTap materials available for sale separate and apart from the textbook. Instead, MindTap functionalities are only accessible by purchasing or accessing the textbook. Indeed, the major MindTap functionalities, such as highlighting, bookmarks, flagging, and personalizing are all tied to the text of the book.  To the extent that Cengage has attempted to sell the MindTap functionalities separately, those functionalities have little to no market value when sold separate and apart from the textbook.

41.     With respect to Cengage Unlimited, Cengage now admits that for this new service it is allocating royalty-bearing revenue to individual authors based on various metrics – none of which are provided for in the Publishing Agreements. Cengage acknowledges that the royalty base for works sold on the Unlimited platform are not based on the net receipt of sales of the work through the subscription service. Instead, Cengage determines royalties for sales through the Unlimited platform by relying on made-up factors such as the "value" of the work relative to other works that have been sold to subscribers on the Unlimited platform and subscribers' usage of the works on the Unlimited platform.  These royalty related calculations are found nowhere in the Publishing Agreements.

42.     Sometime after 2000, Cengage began including language in some new publishing agreements that specified a different royalty calculation for certain "Custom Publication[s]," *i.e.*, publications in which the work is "used by the Publisher in conjunction with any other work as part of a database or other product." In contrast to Cengage's existing agreements at that time, these new agreements specified that "[w]ith respect to any Custom Publication in which the Work is used or portions of the Work are used, a royalty for said use shall be paid to the Author on a pro rata basis (*such pro-ration to be determined in the Publisher's reasonable judgment*) in lieu of" the royalty calculation set forth in the principal royalty provision.

43.     This express deviation from the standard royalty-calculation formula—a pro-ration determined in Cengage's reasonable judgment for electronic databases—reflected a recognition that, if Cengage were permitted to change its royalty-calculation formula for new electronic offerings, it would first need to reach agreement with its authors to change the language in its publishing agreements. But while Cengage changed the language it used in certain *new* publishing agreements going forward, it did not renegotiate existing publishing

agreements entered into with Plaintiffs and members of the proposed Class. Instead, in calculating royalties for MindTap and Unlimited sales, Cengage unilaterally deviated from the standard royalty-calculation formula set forth in its existing publishing agreements—including the *Psychology*, *Essentials*, *Organic Chemistry,* and *Law and Ethics* Agreements.

44.     All of the Publishing Agreements, like all contracts, also contain an implied covenant of good faith and fair dealing, which prohibits Cengage from taking action that undermines the authors' benefits under the Publishing Agreements. Cengage has asserted that it has discretion to determine the form in which works are sold, the sales channel through which they are sold, and the price at which they are sold. Cengage has exercised this discretion in an arbitrary, bad-faith manner.

45.     Cengage has destroyed the fruits of the Publishing Agreements by calculating the revenue base from which royalties are calculated differently (and detrimentally to Plaintiffs) simply because the works are sold through the MindTap and Cengage Unlimited platforms. With respect to MindTap in particular, Cengage has arbitrarily assigned "value" to materials that substantially undercut the royalty base attributed to authors. With respect to Unlimited, Cengage has undercut the value of the contracts by effectively selling thousands of works in a single subscription sale for $119.99 per semester, an arbitrary price that does not reflect the value of the thousands of works sold to every subscriber.

## CLASS ACTION ALLEGATIONS

46.     This action is brought by Plaintiffs individually and on behalf of the following class—referred to herein as the "Cengage Author Class" or "Class"—which consists of:

> All authors of works who entered into a publishing agreement with Cengage Learning, Inc. or one of its predecessors-in-interest whose works have been offered on the MindTap platform and/or as part of the Cengage Unlimited subscription service. This definition excludes: (1) authors whose publishing

agreement contains a "Custom Publishing" provision that provides for royalties determined on a pro rata basis where the pro-ration is determined in Cengage's reasonable judgment; and (2) defendant Cengage and its officers and directors, members of their immediate families, and the heirs, successors or assigns of any of the foregoing.

47.     This Class consists of hundreds of authors and is thus so numerous that joinder of all members is impracticable.  The identities and addresses of Class members can be readily ascertained from business records maintained by Cengage.

48.     The claims asserted by Plaintiffs are typical of the claims asserted by the Cengage Author Class.

49.     Plaintiffs will fairly and adequately protect the interests of the Cengage Author Class and do not have any interests antagonistic to those of the other members of this Class.

50.     Plaintiffs have retained attorneys who are knowledgeable and experienced in breach of contract disputes, as well as class and complex litigation.

51.     Plaintiffs request that the Court afford Class members with notice and the right to opt-out of any class certified in this action.

52.     This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact affecting the Class predominate over those questions affecting only individual members. Those common questions include:

      (a)  how Cengage calculates compensation owed to Class members under the Publishing Agreements for sales on MindTap;

      (b)  how Cengage calculates compensation owed to Class members under the Publishing Agreements for sales on Cengage Unlimited;

(c) whether Cengage breached its contracts with the Class members by failing to compensate Class members in accordance with the terms of the Publishing Agreements;

(d) whether any contractual provision allows Cengage to unilaterally dilute the revenue base used to calculate royalties for sales of the works through MindTap;

(e) whether any contractual provision permits Cengage to calculate royalties under the Publishing Agreements based on the end user's usage of the works; and

(f) whether Plaintiffs and Class members are entitled to receive damages as a result of the unlawful conduct by defendant alleged herein and the methodology for calculating those damages.

53. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(a) due to the complexity of issues involved in this action and the expense of litigating the claims, few, if any, Class members could afford to seek legal redress individually for the wrongs that defendant committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions;

(b) when defendant's liability has been adjudicated, claims of all Class members can be determined by the Court;

(c)     this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

(d)     without a class action, many class members would continue to suffer injury, and defendant's violations of law will continue without redress while defendant continues to reap and retain the substantial proceeds of its wrongful conduct; and

(e)     this action does not present any undue difficulties that would impede its management by the Court as a class action.

<u>**FIRST CLAIM FOR RELIEF**</u>

<u>**Breach of Contract against Cengage**</u>

54.     Plaintiffs reallege and incorporate all allegations of this complaint as if fully set forth herein.

55.     The subject Publishing Agreements are binding and enforceable contracts.

56.     The use of Class members' works on MindTap and Cengage Unlimited have materially breached the Publishing Agreements in several respects, including but not limited to the following:

(a)     Failing to pay Authors for use of the works in accordance with the Publishing Agreements, including the failure to pay royalties on revenue received from sales of the works through MindTap and Cengage Unlimited;

(b)     Allocating the royalty-bearing revenue from use of authors' works to Cengage itself;

(c)     Failing to pay royalties on all royalty-bearing revenue arising from use of the works.

57.     The use of Class members' works on MindTap and Cengage Unlimited have materially breached the implied covenant of good faith and fair dealing in the Publishing Agreements in several respects, including but not limited to the following:

(a)     Selling the works together with MindTap functionalities to dilute the revenue base owed to the Authors;

(b)     Setting prices and subscription fees for MindTap and Unlimited that do not account for the value of the works or Cengage's royalty obligations to textbook authors.

58.     Plaintiffs have performed all of their obligations under the Publishing Agreements, except to the extent that its obligations have been excused by Cengage's conduct as set forth herein.

59.     As a direct and proximate cause of Cengage's material breaches of the policies, Plaintiffs and the Class members have been—and will continue to be—damaged as alleged herein in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFOR, Plaintiff prays for judgment as follows:

1.     Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2.     Awarding Plaintiffs and members of the Class compensatory damages, restitution, disgorgement, and any other relief permitted by law or equity pursuant to the First Claim for Relief;

3.      Awarding Plaintiffs and the Class pre-judgment and post-judgment interest pursuant to their First Claim for Relief, as well as costs;

4.      Awarding Plaintiffs and the Class such other relief as this Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury as to all issues so triable.

Dated: August 12, 2019

*/s/ Kalpana Srinivasan*
Kalpana Srinivasan (*pro hac vice*
application to be filed)
Steven G. Sklaver (*pro hac vice*
application to be filed)
Rohit D. Nath (*pro hac vice*
application to be filed)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Tel:    310-789-3100
Fax:    310-789-3150
ssklaver@susmangodfrey.com
ksrinivasan@susmangodfrey.com
rnath@susmangodfrey.com

Chanler A. Langham
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Tel:    713-651-9366
Fax:    713-654-6666
clangham@susmangodfrey.com

*Attorneys for Plaintiffs*